[Cite as *In re Adoption of L.G.*, 2019-Ohio-2422.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY


In re Adoption of L.G.            Court of Appeals No. S-19-013

           Trial Court No. 20164018


           <u>**DECISION AND JUDGMENT**</u>

           Decided:  June 19, 2019

* * * * *

Lisa M. Snyder, for appellant.

Ron Nisch, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from the January 22, 2019 judgment of the Sandusky County Court of Common Pleas, Probate Division, by appellant, K.G., denying his adoption petition.  For the reasons that follow, we affirm.

**{¶ 2}** Appellant sets forth one assignment of error:

> The trial court abused its discretion by failing to grant the petition for adoption.

## Background

**{¶ 3}** Appellant is the stepfather of L.G., who was born in October 2010. Stepfather is married to L.G.'s mother ("mother"). Appellee is L.G.'s biological father. Father and mother were never married.

**{¶ 4}** When L.G. was about one and one-half years old, the Ottawa County Court of Common Pleas, Juvenile Division, named mother the residential and custodial parent of L.G. and ordered father to pay child support in the amount of approximately $275 per month. At that time, mother lived with her parents and father lived with his parents. Father was granted visitation with L.G. on Tuesdays and Thursdays for two and one-half hours and Saturdays for six hours. At some point, the visitation order was changed so that L.G. would spend the night with father every other Saturday.

**{¶ 5}** Father visited with L.G. according to the schedule until 2012 or 2013, when L.G. was about three years old, at which time father was incarcerated. After father was released from jail, he resumed visits with L.G. until he was incarcerated again for several months. When father was released from jail, he again had visits with L.G.

**{¶ 6}** In September 2015, mother and stepfather were married and moved in together. Father visited with L.G. until June of 2016, when mother found out there were

2.

criminal charges against father and he had an upcoming court date. Thereafter, mother did not allow father to visit L.G.

{¶ 7} On December 29, 2016, stepfather filed a petition to adopt L.G. with the probate court. At the time, father was again incarcerated, and was served with the petition while in jail. In the petition, stepfather alleged mother's consent to the adoption was required but father's consent was not required because father failed without justifiable cause to provide for the maintenance and support of the child for at least a year before the petition was filed. Mother provided her consent to the adoption; father filed an objection.

{¶ 8} On April 13, 2017, a hearing was held on the issue of father's consent. A magistrate issued a decision finding father failed without justifiable cause to provide support for L.G. at least a year before the adoption petition was filed, and father's consent to the adoption of L.G. was not required. On May 1, 2017, the probate court affirmed and adopted the magistrate's decision.

{¶ 9} On September 28, 2017, a best interest hearing was held in the probate court. The court took the matter under advisement. On January 22, 2019, the probate court issued its judgment entry finding it was not in the best interest of L.G. for the adoption to be granted. Stepfather appealed.

3.

**The Best Interest Hearing**

{¶ 10} Numerous witnesses testified at the hearing, including stepfather, mother, an adoption assessor, father, father's mother ("grandmother") and a doctor on father's behalf. The relevant testimony is summarized below.

**Adoption Assessor**

{¶ 11} The assessor testified to the following. She is a private contract employee employed through the court. She receives an adoption application through the court, contacts the petitioner to schedule a home visit, contacts petitioner's four references and prepares a report. She met with stepfather, mother, L.G. and L.G.'s half-sister, M.G., for over two hours, and was able to observe their interactions with each other. She described mother and stepfather's relationship as appearing "very stable, very committed to one another" and assessed stepfather's relationship with L.G. as "very strong." The assessor did not contact father or meet with him, and therefore she was not able to assess anything with respect to his relationship with L.G. The only information the assessor learned regarding father and L.G.'s relationship was reported to her by mother and stepfather. In addition, the assessor did not contact grandmother, father's doctor, or any of father's contacts as "[she] was not aware of any of his contacts."

{¶ 12} The assessor acknowledged, as part of her investigation, that she was aware of the best interest factors the court must consider in deciding whether an adoption is in the child's best interest. She described her investigation as "a comprehensive assessment of the family, the household composition, the relationship between the parties, the

4.

financial ability, the emotional stability, criminal history or any history * * *, references who may have had contact with Petitioner in a setting which would include him with [L.G.] in their relationship, so it is a big scope." The assessor recommended that stepfather's petition for adoption be approved.

**Mother**

{¶ 13} Mother testified at the hearing to the following. L.G. is six years old and she met stepfather when she was eight or nine months old. Stepfather has lived with mother and L.G. since September 2015, when mother and stepfather married. M.G. is mother and stepfather's daughter, and is ten months old. L.G. loves M.G.

{¶ 14} Father has visitation rights with L.G. through an Ottawa County court order, and he last saw L.G. in June 2016. Mother stopped following the visitation order when "[t]hings kind of started to get really messed up the first time he was incarcerated * * * [in] 2012 or 2013." L.G did not see father when he was incarcerated and "the first time he got out, I would let him still see her, but at my house for a couple times, and then * * * things kind of started to go back to normal * * * and then he got in trouble again." Mother contacted her attorney "after the second or third time * * * and I decided it was too confusing for L.G. and with us being married * * * he [father] has not seen her since he got out." After father's last visit with L.G., father would contact mother for visits with L.G., but mother "would decline because that is when I found out about his charges and about his upcoming court date."

{¶ 15} Father was incarcerated three times in the last three years "the most recent was six months * * * [t]hey've all been several months." Father's most recent incarceration was for assault. Mother told L.G. that father was on vacation or away working when he was incarcerated. Father's incarceration impacted his spending holidays with L.G. Father did not send gifts or cards for holidays or birthdays when he was incarcerated.

{¶ 16} L.G. does not ask about father. Father never asked mother about L.G.'s school events or medical appointments, but mother never suggested or offered this information. Stepfather does go to L.G.'s school events.

{¶ 17} L.G. is very close with mother's parents and stepfather's parents "who she sees a lot." L.G. does not currently have a relationship with father's family. When father was incarcerated, grandmother would text mother and, at first, mother responded and allowed grandmother to visit with L.G. at mother's parents' house, where mother lived with L.G. Eventually, mother stopped responding to grandmother "mainly because [L.G.] was happy and content with the way things were, and I didn't want to get her confused, you know, upset her, so [grand]mother has tried to contact me, but in this past year, I have not dealt with that." When mother did communicate with grandmother "we were friendly."

{¶ 18} When L.G. had visits with father, mother would see L.G. "get emotional, crying, and getting herself all worked up, and she would get really quiet." Father lived with grandmother and mother was a little bit concerned about the environment. Mother

6.

did not seek counseling for L.G., "but there was a point when [mother] was considering it."

{¶ 19} Stepfather is employed and mother is employed part-time. Mother and stepfather can financially support L.G. Father never consistently worked or paid his child support order.

{¶ 20} Mother opined adoption is in L.G.'s best interest because "it's good for her to have this stable family of a mom and dad who are together, and we also have M.G. now, so all four of us together." Since visits with father stopped "[L.G.'s] changed a lot since it's just been us, and she hasn't had to go anywhere. She's more outgoing. She's happier. * * * [L.G.] is happy with the way things are."

{¶ 21} If the adoption were not granted, L.G. would still be living with mother, stepfather and M.G., and would go to the same school and doctor and would have the same friends. L.G. tells people her stepfather is her dad, but when L.G. talks to stepfather she calls him by his name. Mother explained to L.G. "that he's her stepdad, and that A.M. is still her dad even though she doesn't see him, and * * * now that we have another child together who calls him dad, it is starting to get more confusing for her."

{¶ 22} In 2016, L.G.'s visits with father were "kind of scattered" because father had an accident. Mother knew father has multiple sclerosis ("MS"), and in March 2016, father suffered a brain injury when he was working and a tree limb fell on his head.

7.

**Stepfather**

{¶ 23} Stepfather heard the testimony of the adoption assessor and mother, and agreed that their testimony was accurate. In addition to those matters addressed by the assessor and mother, stepfather testified to the following.

{¶ 24} He fell in love with L.G. the first time he met her. The main reasons he wants to adopt L.G. are he considers her his biological daughter, he loves her and if something would happen to mother, L.G. and M.G. would be separated and he could not bear the thought of that. "For me, it's more than just being a dad, it's that family structure for her." He "wants the responsibility of being her father, and I'm willing and have been doing both the good and the bad." He has also "fulfilled both the financial, the supportive roles." Stepfather acknowledged if the adoption were not granted, he could still impart life lessons on L.G.

{¶ 25} Regarding visitation, "whenever there was interaction * * * [L.G.'s] very distressed, and from my observations, emotionally, she comes back and she's distant. It usually takes a couple hours for her to kind of become herself again." In early 2016, "when we would meet at Walmart to drop [L.G.] off * * * there was multiple times that we'd get at Walmart and there'd be a last minute cancellation on behalf of [father] and we'd have to leave, and * * * my observation of her emotional state upon that cancellation was one of relief."

8.

**Dr. Bauer**

{¶ 26} Dr. Bauer is a board-certified neurologist, and he testified to the following. Father has been a patient in the doctor's practice for about two years, and father "has been involved with neurology for several years now, because of his diagnosis of [MS], which requires neurological attention, and also the brain injury."

{¶ 27} Prior to father's work injury on March 22, 2016, father was diagnosed with MS, depression, GI bleed, memory issues, attention deficit disorder ("ADD"), and scoliosis. Father "had significant difficulty with his nervous system that would impact his ability to work, his ability to have cognitive function, and behavioral difficulties as a consequence of those diagnoses." The doctor opined father's MS, ADD and depression "would make it difficult for [father] to maintain a full time and a continuing job. Father was * * * a mason at one time, and * * * working with trees when he was injured with the brain injury."

{¶ 28} Father suffered bleeding in the brain and commotion to the brain as a result of the work accident. Regarding the recovery process for a brain injury, "[y]ou can have over 18 months significant reversal and over the next two to three years." The brain injury aggravated father's conditions, "[s]o that would make it tough for him during that period of time. He obviously could not be employed." The doctor recommended to father "first and foremost we've got to get him so he can function * * * and get his strength and his [MS] under control."

9.

**{¶ 29}** Regarding father's relationships with family members, the doctor opined "there is always a risk that he'll have outbursts and behavior issues," but father "understands what he has to do to control them, and I think that he is making a good effort to do that, and I think he is capable of fathering a daughter without significant risk." Father's "troublesome relationships are more adult. I don't think that he has significant difficulties [i]n relating to a child * * * [father] is a low risk [to a child]."

**{¶ 30}** The doctor was aware that father had been in jail. The doctor opined "I think [father] wants to improve on his situation. I think he would like to have a relationship with his daughter." Based on father's medical condition, the doctor did not have any issue with father's ability to provide care to his daughter.

## Father

**{¶ 31}** Father testified to the following. He graduated from high school in 2008, and met mother at Put-in-Bay in the summer of 2009 or 2010, where they were both working. Father and mother then had L.G. together.

**{¶ 32}** Father used to visit with L.G. as much as he could and as much as schedules allowed, at least twice a week. In the beginning, the visitation order was followed for holiday visits, but towards the end "it was not existent really." He currently has court-ordered visits with L.G. but has not been able to see her for the past year. In an effort to request visits, father texted mother and "called her a lot * * * but it took weeks for me to get an answer from her * * * and a lot of times * * * I wouldn't get a response at all." He did not file a motion with the court because he was not working and did not

10.

have money to hire a lawyer. Father hoped the situation would improve. Grandmother also tried to reach out to visit L.G. many times and "she gets no response 99 percent of the time."

{¶ 33} When father was visiting with L.G., he would pick her up and at first she would be shy and crying and would not want to come, "but about ten minutes into the visit every time, she would loosen up." He would ask her about school, what she wanted to eat and what she wanted to do. Father "was never made aware of any problems of her being quiet at home or anything like that." During visits, father would take L.G. to the house where he lived with his father in Oak Harbor, to his grandma's house in Port Clinton or to the beach or Walmart. Father had contacted mother about L.G.'s school information.

{¶ 34} On March 22, 2016, which was father's first day of work for a tree company, a "pretty good sized branch * * * 30 feet long" and nine inches in diameter fell "right on top of my head." Father woke up in the hospital three days later. He sustained a fractured skull and fractured spine, in three places. Father suffered from MS before the accident and his symptoms include really bad headaches, joint pain, and muscle pain.

{¶ 35} After the accident, father worked at a restaurant for two weeks, but was incarcerated for 180 days for assault, and was terminated from the job. While in jail, he was served with the adoption petition. He tried to contact mother but did not get an answer.

11.

**{¶ 36}** Father suffered from depression which made him feel useless, like he was not able to do anything or accomplish his goals. He is currently feeling a lot better and is ready and able to engage with L.G. He has always wanted to visit L.G., and misses her.

**{¶ 37}** Father thinks mother is a good person and good mother; his complaint is "[j]ust that she keeps me from my daughter." He acknowledged he has made mistakes, which prevented contact with L.G. at times, and he has costs associated with his criminal cases.

**{¶ 38}** Father did not earn any money in 2016. Father wants to work with his doctors and others to figure out a job or career, he wants to pay his child support and bills and he "definitely wants to improve on my situation for sure."

**{¶ 39}** Father is currently 28 years old and lives in Oak Harbor with his father. He helps out around the house as much as possible, has a driver's license and is able to drive. He does not know stepfather, and there are no difficulties between father and stepfather. Father requested that the adoption petition be denied.

**Grandmother**

**{¶ 40}** Grandmother testified to the following. She has not seen her granddaughter, L.G., for a long time, since about May 2016. Prior to his work injury, father was exercising visitation with L.G. and grandmother took father there. "I tried to get to every one of them when he'd get his Tuesday, Thursday, Saturdays [visits]." She was present during the visits either at her house or at her mother's home in Port Clinton, on the days when visits were short. Most of the time, L.G. would be picked up at mother's mother's

12.

home, where mother and L.G. were living. After mother got married and moved to Fremont, exchanges never occurred at mother's new home. Grandmother does not know mother's current address.

{¶ 41} Grandmother's relationship with L.G. was good and they played, went to the park, played putt-putt, went shopping and cooked. "We also had to make jello or a cake when she was at my house. We just, you know, tried to do things that grandma's [sic] would do with you * * * we played a lot. Laughed a lot."

{¶ 42} Regarding the relationship between L.G. and father, L.G. "knew he was her daddy, and she played with him. They played all the time * * * he bought her a tool box and she loved that. * * * She liked to go out in the garage and play with her toolbox."

{¶ 43} Grandmother had a pretty good relationship with mother. "I think she is a good mother. * * * [I]t was a difficult situation, so * * * I always got along with her as far as I know." After May 2016, grandmother attempted to contact mother, "I texted. I called. I asked to see [L.G.] for her birthday, for * * * Christmas, bring her presents, stuff like that, I never got an answer."

{¶ 44} Since the March 2016 accident, father's "memory is really bad * * * [and] his ability to stay on task sometimes is difficult." Father has weakness, sometimes his legs are numb and he cannot feel them, he has severe headaches, his arms and hands go numb, he has vibrations in his spine, he is withdrawn and depressed. Father's injuries would not present any issue in his caring for L.G., and father "is good with kids." When asked if she would be willing to assist in caring for L.G. during father's visits,

13.

grandmother replied, "Well, absolutely. I'd be there any time regardless. I want to see her as much as he does." Grandmother was asked if she wanted to continue contact with L.G., she said, "Of course."

**Probate Court's Judgment Entry**

{¶ 45} In the judgment entry, the probate court provided a brief summation of the witnesses' testimony from the best interest hearing. The court found "[a]ll witnesses were viewed as credible, honest and sincere * * * [and] [t]heir cumulative testimony presented a picture of a loving and caring family, who all genuinely appeared to have the best interest of the minor child at heart." The court further found, based on the child's age and maturity and the limited value of her opinion regarding the matter at issue, the request for an in camera interview of the child was denied as unnecessary.

{¶ 46} The court stated it thoroughly reviewed the case file, including the trial testimony, statutory and case law, exhibits and trial notes from the best interest hearing, as well as the adoption petition, the assessor's report, personal recommendations, the judgment entries from the consent hearing, and counsels' written closing arguments. The court indicated, in making its decision, it gave special attention to the best interest factors and standards set forth in R.C. 3107.161. The court determined it was not in the best interest of L.G. for the adoption to be granted, as it was in the best interest of the child to maintain a relationship with both sides of her family.

14.

**Law**

{¶ 47} In an adoption proceeding, the probate court must undertake a two-step analysis, which consists of a consent phase and a best interest phase. *See In re Jeffrey A.*, Sixth Dist. Lucas No. L-08-1006, 2008-Ohio-5135, ¶ 4. In the first step, the court decides whether or not a parent's consent to the adoption is required. *See In re Adoption of Jorgensen*, 33 Ohio App.3d 207, 209, 515 N.E.2d 622 (3d Dist.1986). If it is determined that the parent's consent is not required, the next step is for the court to decide whether or not the adoption is in the child's best interest. *Id.* The person contesting the adoption has the burden of providing the probate court with "material evidence needed to determine what is in the best interest of the child and must establish that the child's current placement is not the least detrimental available alternative." R.C. 3107.161(C).

{¶ 48} R.C. 3107.17(B) provides that in an adoption proceeding, in determining the best interest of the child, the probate court shall consider all relevant factors including, but not limited to:

> (1) The least detrimental available alternative for safeguarding the child's growth and development;

> (2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;

(3) The wishes of the child in any case in which the child's age and maturity makes this feasible;

(4) The duration of the separation of the child from a parent;

(5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements;

(6) The likelihood of safe reunification with a parent within a reasonable period of time;

(7) The importance of providing permanency, stability, and continuity of relationships for the child;

(8) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(9) The child's adjustment to the child's current home, school, and community;

(10) The mental and physical health of all persons involved in the situation;

(11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense

involving any act that resulted in a child being abused or neglected [or other specific crimes].

**{¶ 49}** The "least detrimental alternative" factor is defined as "the alternative that would have the least long-term negative impact on the child." R.C. 3107.161(A).

**{¶ 50}** An appellate court reviewing this decision applies an abuse-of-discretion standard. *In re Jeffrey A.* at ¶ 13. An abuse of discretion indicates the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "The probate court alone weighs the testimony and determines the credibility of the witnesses." *In re Jeffrey A.* at ¶ 13.

## Arguments

**{¶ 51}** Stepfather takes issue with the probate court's determination that it was not in L.G.'s best interest for the adoption to be granted. He maintains he provided the probate court with clear and convincing evidence that the adoption was in L.G.'s best interest, and it was father's burden to provide the probate court with clear and convincing evidence that the adoption was not in L.G.'s best interest and was the least detrimental available placement. Stepfather asserts father did not present meaningful evidence to satisfy his burden that the adoption was not in L.G.'s best interest. He contends most of father's evidence was related to father's medical diagnosis and work-related injury which occurred when father "was no longer exercising his Court Ordered visitation" with L.G.

17.

{¶ 52} Stepfather claims the adoption assessor, "after completing a thorough assessment," recommended that the adoption was in L.G.'s best interest. He asserts father failed to present any evidence challenging that recommendation.

{¶ 53} Stepfather maintains "there is nothing in the record indicating that the visitation was positive for [L.G.]" and the visits were sporadic and inconsistent. He asserts father did not see L.G. the last three Christmases because he was incarcerated, and father did not send cards or presents to L.G. for birthdays or holidays during his absences.

{¶ 54} Stepfather contends he and mother are both employed and financially support L.G. and M.G., and he provides medical insurance for L.G. He observes neither he nor mother have any criminal history. Stepfather submits he has been active in L.G.'s academics and medical care, and with family activities. He maintains he is qualified to care for and rear L.G., and he and mother offer L.G. a stable, loving home.

{¶ 55} Stepfather argues he and mother have no physical or mental health concerns while father has both. He asserts father's physical and mental health issues create concerns about father's "parenting going forward."

{¶ 56} Father counters he provided sufficient evidence to the probate court that the adoption was not in L.G.'s best interest. He contends he presented testimony at the best interest hearing that he and his family had frequent contact with L.G. and a good relationship with her prior to June 2016.

18.

{¶ 57} Father maintains the adoption assessor only considered facts about him which were provided by stepfather and mother, and did no investigation of father's situation and how continued contact between him and L.G. might benefit L.G.

{¶ 58} Father noted mother testified that no harm was ever done to L.G. while she was with father. He acknowledged having some criminal difficulty, but mother unilaterally kept him from L.G. despite a juvenile court visitation order.

**Analysis**

{¶ 59} At the outset, we note the probate court determined father's consent to the adoption was not required as he had failed to provide support for L.G. for the requisite one-year time period. The consent determination has not been contested by father, so we need not address that issue.

{¶ 60} Regarding the probate court's best interest determination, we find the court did not abuse its discretion in deciding it was not in L.G.'s best interest for the adoption to be granted, as it was in L.G.'s best interest to maintain a relationship with both sides of her family. We conclude the court, in reaching its decision, properly considered the relevant best interest factors, weighed the evidence and ascertained the witnesses' credibility.

{¶ 61} A review of the record shows stepfather presented an abundance of evidence that he loves and cares for L.G. Father did not challenge the adoption petition on the basis of stepfather's ability to care for and support L.G. Rather, father offered evidence of his efforts and grandmother's efforts to visit with L.G., and mother's refusal

19.

to allow visits for the past year with father or his family despite court-ordered visitation. The evidence reveals father and grandmother expressed a willingness to play a role in L.G.'s life, but were denied the opportunity by mother, who chose to terminate visits in June 2016. Father also presented evidence concerning his health issues, the progress he has made, and his outlook for the future.

{¶ 62} With respect to the adoption assessor and her report, the probate court noted the assessor had "completed a detailed and thorough written report" despite her acknowledgement "that she did not meet the [father] of anyone from his side of the family during her investigation." We find it difficult to understand how the assessor could make a sound recommendation regarding whether or not the adoption was in L.G.'s best interest with information garnered from only one side of L.G.'s family. We therefore find father's arguments compelling, that the assessor only considered information about him which was provided by stepfather and mother, the assessor failed to investigate father's situation, and the assessor neglected to examine how continued contact between father and L.G. might be beneficial to L.G. Nevertheless, we find the probate court gave proper weight to the assessor's report and testimony, since the record shows the assessor recommended approving the adoption, but the probate court determined adoption was not in L.G.'s best interest.

{¶ 63} Considering all of the evidence presented, we conclude the probate court's decision to deny the adoption petition was not unreasonable, arbitrary, or unconscionable.

20.

**{¶ 64}** On consideration whereof, the judgment of the Sandusky County Court of Common Pleas, Probate Division, is affirmed. Stepfather is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____

JUDGE

Arlene Singer, J.         

_____

Thomas J. Osowik, J.        JUDGE
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.